Craig CALLAWAY, Cherlyn King, Jocelyn Valencia, Stephanie Davies–Kahn, Plaintiffs,

v.

David SAMSON, Attorney General of the State of New Jersey; Rosemary Adams, City Clerk of the City of Atlantic City; Joseph G. Gindhart, City Solicitor of the City of Atlantic City; City of Atlantic City, Defendants.

CIVIL ACTION NO. 02–1009.

United States District Court, D. New Jersey.

April 5, 2002.

Seth Grossman, Robert Loefflad, Seth Grossman & Associates, Somers Point, NJ, for Plaintiffs, Craig Callaway, Cherlyn King, Jocelyn Valencia, and Stephanie Davies–Kahn.

David Samson, Attorney General of New Jersey, Allison Accurso, Assistant Attorney General, Donna Kelly, Senior Deputy Attorney General, Pamela E. Gellert, Deputy Attorney General, for Defendant, David Samson.

Matthew B. Wieliczko, Natonya Phillips, Zeller & Bryant, LLP, Cherry Hill, NJ, for Defendants, Rosemary Adams, Joseph G. Gindhart, and City of Atlantic City.

OPINION

ORLOFSKY, District Judge

## I. INTRODUCTION

The question presented for resolution in this case is whether the State of New

Jersey can bar a lifelong resident of Atlantic City from seeking a seat on the city council representing a ward in which he has resided only briefly, but in which he has worked for two decades. Specifically, the Plaintiff candidate challenges New Jersey's statutory requirement that candidates for election to local office have resided in the particular ward or district in which they seek election for one year before they may be eligible for office. N.J. Stat. Ann. §§ 40A:9–1.11, –1.13 (West 1993). The Plaintiff candidate, who has lived in the city of Atlantic City all his life and worked there for far longer than one year, argues that the requirement impermissibly burdens his First Amendment right to seek office, as well as his Fourteenth Amendment right to travel. The remaining Plaintiffs are registered voters in the ward in which the Plaintiff candidate desires to run. They have alleged that, given the opportunity, they would vote for the Plaintiff candidate. They claim that New Jersey unconstitutionally restricts their right to vote for the candidate of their choosing.

Although the combined rights of voters and candidates to be free of durational residency restrictions have been the subject of other recent litigation in this Court, see Robertson v. Bartels, 150 F.Supp.2d 691 (D.N.J.2001), the standard of review for violations of those rights is uncertain. However, New Jersey's durational residency requirement may also affect the Plaintiff candidate's right to intrastate travel, a right recognized in this Circuit. See Lutz v. City of York, 899 F.2d 255, 256 (3d Cir.1990). Indeed, the Third Circuit has held that state enactments burdening the right to intrastate travel are subject to intermediate scrutiny. Id. at 269.

Thus, rather than explore the uncertain boundaries of the collective right of candidates and voters to be free of ballot restrictions, I consider simply whether the State of New Jersey can justify with a narrowly tailored and significant interest the burdens it has imposed on the right to intrastate travel. I conclude that, based on the facts and circumstances of this case, it cannot do so. In particular, where the Plaintiff candidate has worked for almost twenty years in the very ward where he seeks election, has moved a distance of approximately thirteen city blocks from his prior residence, and has lived in the City he seeks to represent on the city council for his entire life, I find little State interest in excluding him from the ballot. I need not, and therefore do not, consider whether New Jersey's durational residence requirement for candidates seeking local office might be constitutional as applied to other candidates in other factual settings.

Thus, for the reasons set forth in more detail below, I conclude that New Jersey's durational residency requirement is unconstitutional as applied to the Plaintiff candidate, and shall order Defendants to place his name on the primary ballot.

## II. FACTS AND PROCEDURAL HISTORY

The material facts giving rise to this dispute are uncontested and have been stipulated to by the parties. Craig Callaway is a lifelong resident of Atlantic City. Until January of this year, he resided at 500 Wabash Avenue in Atlantic City. On January 31, 2002, he moved approximately thirteen blocks, to 725 North Ohio Avenue. He has since relocated twice more, both times apparently a relatively short distance.

Callaway's perambulations are explained by the electoral map of his home city. Atlantic City is divided into six "wards," each of which is entitled to one representative on the city council. The council also includes three at-large members. Callaway's pre-January residence, at 500 Wa-

bash Avenue, was in what was then the Second Ward, and is now, subsequent to redistricting based upon the 2000 census, in the First Ward. 725 North Ohio Avenue, and the two residences Callaway has occupied since, are all within the City's Third Ward. Not coincidentally, the city council seat for the Third Ward became vacant on or about February 13, 2002. Callaway, by his own admission, moved in order to become eligible to occupy that seat.

Callaway's ambitions were stymied, however, by a ruling of the City of Atlantic City's Solicitor's Office that he was not eligible to run for the Third Ward seat, notwithstanding his move. According to the City Solicitor, New Jersey law requires that a candidate for local office have resided in the "local unit" for which he seeks office for "at least one year prior to the date upon which the election for the office is to be held." *See* N.J. Stat. Ann. § 40A:9–1.13 (West 1993) ("the residency requirement"). "[W]henever an office is required to be filled by election from a district, ward or other subdivision," the term "local unit" means "the district, ward or subdivision to which the office pertains." *Id.* § 40A:9–1.11. In other words, it is not enough that Callaway has lived in Atlantic City for over forty years; he must have lived in the particular ward for which he seeks election for at least one year before he can be elected to represent it.

Callaway responded to the City Solicitor's Letter Opinion by filing this Complaint, pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment, in which he requests that this Court declare the durational residency requirement unconstitutional, and issue an injunction, directing the City Clerk of Atlantic City to enter Callaway's name as a candidate eligible for election to the city council from the Third Ward. Callaway's Complaint named not only the City of Atlantic City, and its City Clerk and City Solicitor, but also the At-torney General of New Jersey, David Samson. As the parties agreed that the statutory deadline for the City Clerk to act is April 8, 2002, I directed the parties to brief the issues presented on an expedited schedule. On April 3, 2002, I held a hearing and heard oral argument on Callaway's Motion for a Temporary Restraining Order. The parties agreed at the hearing that no material fact was in dispute, and upon my suggestion, further agreed that, pursuant to Fed.R.Civ.P. 65(a)(2), the pending Motion for a Temporary Restraining Order could be converted to a Motion for Permanent Injunctive Relief.

## III. DISCUSSION

The first task in addressing any constitutional challenge is, necessarily, to identify the constitutional rights at issue. That determination, in turn, will likely reveal what level of scrutiny the court should apply to the challenged statutory provisions. As the array of plaintiffs in this case suggests, state restrictions limiting a candidate's access to the ballot may implicate a variety of different interests. The Supreme Court has attempted to simplify matters by lumping together the rights of candidates, voters and, at times, political parties, and comparing the composite whole against the putative interests of the State in its regulation. *See, e.g., Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Munro v. Socialist Workers Party*, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

Unfortunately, even after consolidating many of the Plaintiffs' possible rights at issue, the level of scrutiny that this Court should apply is not particularly clear. The Attorney General contends that, under

*Timmons,* I should conduct a straightforward balancing of the interests on either side, such that the residency requirement in question here can be sustained as an "important" and "reasonable, nondiscriminatory" restriction that outweighs the relatively modest combined interests of Callaway in running for local elective office and of affected voters in selecting him as their candidate of choice. *Timmons,* 520 U.S. at 358, 117 S.Ct. 1364. The Third Circuit, when it last considered the question of durational residency requirements for candidates for local office, read the Supreme Court's ballot restriction line of cases as mandating strict scrutiny of those requirements. *See Wellford v. Battaglia,* 485 F.2d 1151, 1152 (3d Cir.1973) (per curiam). In other cases challenging different ballot access restrictions, however, the Third Circuit has adopted a more liberal balancing test. *See Council of Alternative Political Parties v. Hooks,* 179 F.3d 64, 70–71 (3d Cir.1999). Some members of the Supreme Court itself were, as of 1986, of the view that the Court applied strict scrutiny to at least some ballot access cases. *See Munro,* 479 U.S. at 201, 107 S.Ct. 533 (Marshall, J., dissenting). While there is a plausible argument that *Timmons* demonstrates that both the *Wellford* court and Justice Marshall were misreading the Court's earlier opinions, I am reluctant to ignore what may be controlling precedent. *Cf. Robertson,* 150 F.Supp.2d at 696 (Debevoise, J.) (applying strict scrutiny to durational residency requirement burdening "combined right of persons to run for public office and the right of voters to vote for candidates of their choice").

■ In this labyrinth of conflicting decisions, the straighter course is to set aside for the moment the rights of the candidate

*qua* candidate and instead to consider whether the residency requirement is invalid as an undue burden on Callaway's fundamental right to travel. "A State, outside certain ill-defined circumstances, cannot classify its citizens by the length of their residence in the State." *Saenz v. Roe,* 526 U.S. 489, 515, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (Rehnquist, C.J., dissenting). If Callaway had come to New Jersey from outside the State of New Jersey, he almost certainly would have a plausible argument that the residency requirement unconstitutionally classifies him according to how long ago he ended his interstate travel and settled in the Third Ward. Callaway, however, is a lifelong resident of Atlantic City. Federal courts do not ordinarily consider claims by an individual that a statute is unconstitutional because it might violate someone else's rights. *See Clements v. Fashing,* 457 U.S. 957, 966 n. 3, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality op.) (citing *Ulster County Court v. Allen,* 442 U.S. 140, 154–55, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)).[1] Thus, Callaway can only claim an undue burden on his right to travel within the State of New Jersey.

■ The Third Circuit recognizes a right to travel of a somewhat different sort: a fundamental right to *intra*state travel, given constitutional force by the Due Process Clause. *See Lutz v. City of York,* 899 F.2d 255, 256, 267 (3d Cir.1990). State action that infringes the right to "localized intrastate movement" can be sustained if it is "narrowly tailored to serve significant government interests— not necessarily compelling ones." *Id.* at 267, 269. In short, I must apply a form of intermediate scrutiny. *Id.* at 269.

---

1. At oral argument, Callaway asserted that he was challenging the residency requirement both facially and as applied. Facial challenges, however, are generally only available

where a statute might chill free speech or expression. *See* Richard H. Fallon et al., *Hart & Wechsler's The Federal Courts and the Federal System* 202–211 (4th ed.1996).

■ The residency requirement in this case does plainly burden Callaway's right to travel within the State of New Jersey. The statute conditions his eligibility for public office, one of the highest honors and privileges of our democratic system, on his willingness to remain within the relevant geographical unit for one year. *See Dunn v. Blumstein*, 405 U.S. 330, 338, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). ("Obviously, durational residence laws single out the class of bona fide state and county residents who have recently exercised [the right to travel].") If Callaway were inclined to move from ward to ward every eleven months, he would never be able to hold office. It might be observed that, assuming he is not quite that itinerant, the burden on Callaway is relatively slight; he is merely asked to wait a short while before he can seek the office he desires. *See Clements*, 457 U.S. at 967, 102 S.Ct. 2836 (plurality op.) (citing *Chimento v. Stark*, 353 F.Supp. 1211, 1216 (D.N.H.) (three-judge court), *aff'd mem.*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973)). That argument overlooks an important feature of the real world of electoral politics: an open seat, or a seat with a vulnerable incumbent, is a once-in-a-blue-moon event. Incumbents for offices at all levels win about 90% of elections. *See* Daniel Hays Lowenstein, *Election Law: Cases and Materials* 655–58 (1995) (summarizing studies). Thus, a system that forecloses candidates, such as Callaway, from running for open seats is likely to doom those candidates to a long series of largely quixotic quests for office.

I must, therefore, consider whether the Defendants have identified any sufficiently weighty and well-tailored state interests to counter-balance the burden on Callaway's right. The parties, and my canvass of the pertinent cases and literature, suggest at least three possible interests. The Attorney General emphasized at oral argument the state's interest in ensuring that candidates will be familiar with the issues of their constituency, and that voters will have an opportunity to know the candidates. Some cases have also alluded to an interest in preventing "carpetbagging." *See, e.g., Robertson*, 150 F.Supp.2d at 697. Finally, durational residency limits may serve to buttress the State's interest in geographical limitations, much the way that "anti-raiding" statutes restricting last-minute enrollment in a political party before a primary support a State's interest in protecting the associational rights of the parties. *See Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

The State's interest in guaranteeing knowledgeable candidates varies in strength depending on the office sought and the prior residence of the candidate. Candidates for statewide office might easily be well-informed about New Jersey without ever having set foot here. We live in a culture that is increasingly national, where the Internet, nationwide television news and national newspapers bring us closer together as a community, and constantly inform us of the hopes and struggles of our neighbors, at least as those aspirations and failures are writ large. On the other hand, it may well be reasonable to say that a candidate who relocates from Nome, Alaska to Atlantic City, New Jersey, will be relatively unlikely to know immediately the peculiar *local* problems of his or her new home. That assumption loses force as the point of origin of the candidate moves closer to the final destination. Ultimately, it seems almost absurd to say that someone who lives his whole life in a city doesn't know enough about the problems of his neighbors, simply because they live on the other side of an invisible line that runs down the middle of their street. That is especially true when those lines are prone to wander. *See Robertson*, 150 F.Supp.2d at 699.

Thus, although New Jersey may well have an interest in assuring that candidates will know their would-be constituency well,[2] the residency requirement in question in this case is tied so loosely to that interest that it at times actually works against it. For example, under the residency requirement, a hermit who walled himself up in his apartment for a year, receiving food through a slot in the door, would be deemed more "knowledgeable" than the George Bailey[3] who knocks on every door, and shakes every hand, but lives thirteen blocks away in another ward. To be sure, the States are often permitted to sweep too broadly, or too narrowly, in carrying out legitimate regulatory goals. *See, e.g., Weinberger v. Salfi,* 422 U.S. 749, 771–73, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (holding that, under rational basis review, a statute is not invalid simply because it affects some persons not included within the purpose it is supposed to serve). While intermediate scrutiny does not require that the state's chosen means be the least restrictive possible, it does require a somewhat more concordant relation than the residency requirement has to the goal of ensuring knowledgeable candidates. A statute that excludes a candidate for local office, such as Callaway, who has lived his whole life in a city, and worked for nearly twenty years in the very ward in which he seeks election, *see* Callaway cert. ¶ 13, can hardly be said to have a close relation to the goal of promoting well-informed candidates for local office.

Similarly, the one-year residency requirement seems not especially well-tailored to the State's interest in assuring that voters will know about the candidate. For example, in our modern media-saturated culture, most voters can and do learn almost everything they will ever know about a candidate only in the month or so before the election. *See Blumstein,* 405 U.S. at 358, 92 S.Ct. 995. Nor, again, does the residency requirement account for candidates who may be the "richest man in town," whether in the sense of George Bailey or Mr. Potter, and hence well-known to everyone regardless of which ward, or which district, they happen to choose as domicile. The one-year residency requirement simply sweeps away all the complex web of interests and connections we know that we share with our neighbors down the street, our coworkers, our relatives in the next town, even with strangers whose faces and stories come to us, often vividly, through newsprint and the television screen. It may be that an election itself is the only process sufficiently nuanced to measure those ties. I need not decide that question now.

Furthermore, the parties have not drawn my attention to, and I have not independently located, any reported decision in which a court has found a significant state interest in preventing "carpet-bagging." The term has its origins in Southern Reconstruction hostility to Northern migrants, and I am not sure that it has ever lost the flavor of parochialism and favoritism. While voters may have the power to vote their personal prejudices, I do not believe that the law is obliged to aid them in that goal. New Jersey, it must be said, has some acquain-

---

2. It strikes me that in most cases the market, which is to say the electoral process, will do an adequate job of achieving the same goal. Rational voters prefer candidates who know what the voters want over candidates who do not. On the other hand, it might be the case that local elections, in particular, command relatively little attention from voters and the media, so that information about candidates is scarce. Conceivably, that might be a "market failure" that would justify state involvement.

3. George Bailey, of course, is Jimmy Stewart's character in the Frank Capra classic, *It's a Wonderful Life* (RKO Radio Pictures 1946).

tance with invidious discrimination against migrants perceived to be indigent or burdensome. *See S. Burlington County NAACP v. Mount Laurel Township,* 67 N.J. 151, 336 A.2d 713 (1975). In any event, even assuming that preventing "carpetbagging" were a legitimate and significant state interest, I again see little relation between that end and the residency requirement at issue here, which by implication labels as "carpetbagger" a candidate who merely moves down the street, or as in this case, thirteen city blocks.

Finally, there is an insufficiently close relationship between the goal of protecting legitimate geographical limitations and the one-year residency requirement. Geographical limits appear in the United States Constitution itself. *See* U.S. Const. Art. I § 2 cl. 2. A political scientist might find justification for them not only in administrative necessity but also in the need to prevent "externalities." A public servant should have to internalize the costs of his or her decisions. In other words, legislators should be affected by their own laws. By this argument, a city councilor should not be able to raise property taxes in Atlantic City without paying them himself. The one-year residency requirement, however, serves that end badly, if at all. For example, the danger of externalities is not present at all for candidates for statewide office who come from within the state. Nor, more pertinently for Callaway, do city councilors from neighboring wards within the same city have much opportunity to benefit themselves at the expense of their voters.

I conclude, therefore, that the Defendants have not identified any "narrowly tailored" and "significant" government interest in the residency requirement to sustain it in the unique factual circumstances of this case. As I have noted, the degree of the State's interests, and the relation between the residency requirement and those interests, might vary depending on the office sought and the background of the candidate. I therefore emphasize that this case involves a challenge to the statute only as it has been applied to Callaway. I intimate no view as to the constitutionality of the residency requirement in other cases. I conclude only that in this case, the challenged statute impermissibly burdens Callaway's right to "intrastate travel." *Lutz,* 899 F.2d at 267.

## IV.  CONCLUSION

For the reasons set forth above, I shall declare that N.J. Stat. Ann. §§ 40A:9–1.11, –1.13 are unconstitutional as applied to Callaway. Accordingly, I shall also grant the Plaintiff's Motion for a Permanent Injuction, and direct the Defendants to place Callaway on the appropriate primary ballot for city council in Atlantic City's Third Ward.