**LUTZ, David D., Appellant,**

v.

**CITY OF YORK, PENNSYLVANIA.**

No. 89–5252.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1989.

Decided March 28, 1990.

Daniel M. Fennick (argued) and William C. Anderson, Anderson, Converse and Fennick, P.C., York, Pa., for appellant.

Edward C. Roberts (argued), Kain, Brown & Roberts, York, Pa., for appellee.

Before BECKER, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

In 1988, the city of York, Pennsylvania enacted an ordinance outlawing "cruising," which consists of driving repeatedly around a loop of certain major public roads through the heart of the city, an apparently popular activity among local youth. Plaintiffs Lutz and Weber brought suit in the district court for the Middle District of Pennsylvania seeking declaratory and injunctive relief on the grounds that the ordinance violates their right to travel and is overbroad.[1] The district court rejected these challenges, held that the ordinance was a valid traffic regulation, and dismissed the action.

The appeal implicates an important and largely unexplained area of constitutional jurisprudence—whether there exists an unenumerated constitutional right of *intra*state travel. We conclude that such a right exists, and grows out of substantive due process. In setting a standard of review to evaluate restrictions that significantly impinge on that right, we apply intermediate scrutiny, as suggested by analogy to the time, place and manner doctrine so firmly entrenched in the jurisprudence of free speech. Concluding that the York ordinance constitutes, in essence, a reasonable time, place and manner restriction on localized intrastate movement, we reject the plaintiffs' right to travel challenge. Also, because the overbreadth doctrine does not apply outside of the First Amendment context, we reject plaintiffs' overbreadth challenge as well. Therefore, although our

---

1. Plaintiffs argued to the district court that the ordinance also violates their freedom of association, but have dropped that claim on appeal in light of intervening adverse Supreme Court precedent. *See City of Dallas v. Stanglin,* —— U.S. ——, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989).

reasoning differs from that of the district court, we will affirm.

## I. THE ORDINANCE AND ITS JUSTIFICATIONS

The York ordinance prohibits cruising in a designated area of the city. "Cruising" or "unnecessary repetitive driving" is defined as

driving a motor vehicle on a street past a traffic control point, as designated by the York City Police Department, more than twice in any two (2) hour period, between the hours of 7:00 p.m. and 3:30 a.m. The passing of a designated control point a third time under the aforesaid conditions shall constitute unnecessary repetitive driving and therefore a violation of this Ordinance.

York, Pa., Ordinance No. 6, § 3(a) (Apr. 19, 1988). "Traffic control points" are "clearly identified reference point[s]" designated by the police, which may be placed only along certain blocks of Philadelphia and Market Streets, two major thoroughfares in downtown York. *See id.* §§ 3(b), 3(c).[2] Whenever a violation occurs, exactly one person is deemed to be cruising—the car's owner, if present, or otherwise the driver. *See id.* § 4. Violators, if convicted, are fined $50. *See id.* § 7. Municipal and commercial vehicles are excluded from the ordinance, *see id.* § 5, which also contains a standard severability clause, *see id.* § 8.

The ordinance was passed in response to the following legislative findings:

It is hereby found that with consistency, on certain days and times, a threat to the public health, safety and welfare arises from the congestion created by repetitive unnecessary driving of motor vehicles on main thoroughfares within the City of York. The purpose of this Ordinance is to reduce the dangerous traffic congestion, as well as the excessive noise and pollution resulting from such unnecessary repetitive driving, and

to insure sufficient access for emergency vehicles to and through the designated city thoroughfares now hampered by this repetitive driving of motor vehicles. *Id.* § 2.

Several York officials defended the ordinance in testimony before the district court. Thomas Gross, a York police officer assigned to coordinate traffic safety, recited findings of a study indicating that traffic in the affected area, measured in terms of cars passing per unit time, is almost as high from 9 p.m. to 11 p.m. on a Friday night as it is during the afternoon rush hour.[3] Gross testified further, from personal observation, that congestion during cruising hours was even worse than congestion during rush hour: during rush hour, traffic was "heavy, but flow[ed] smoothly," while traffic during cruising hours was often at "virtually a complete standstill, for minutes at a time." App. at 37, 39.

Keith Ressler, the night shift supervisor of the York Police Department, testified that because of cruising, traffic often became bumper-to-bumper for several blocks. As a result, it could take as long as 20 minutes to travel two blocks in the affected areas. He further testified that emergency vehicles were unable to respond quickly to calls during cruising hours, and that sometimes police cars had been forced to drive on the sidewalk to circumvent the congestion. Echoing Gross's testimony, Ressler stated that the traffic problem was worse during cruising hours than during rush hour: during rush hour, "traffic flows smoother [sic]" because motorists "are going somewhere"; during cruising hours, by contrast, "[t]raffic on the loop flows erratically and sometimes not at all" because "[c]ars will remain stopped in lanes of traffic so the occupants of one car can talk to the occupants of another car even though there is a green light." *Id.* at 50–52.

---

**2.** The designated areas on those streets are part of the loop frequented by the cruisers, who drive east on Market Street and then west on Philadelphia Street through an area that covers a total of about 22 blocks.

**3.** The count took place in November, 1983, and Gross testified that the volume of cruising traffic would be "much higher" during the summer. App. at 39.

George Kroll, the York fire chief and ambulance administrator, testified that two of York's fire stations were located within the loop frequented by the cruisers. He stated that traffic in front of the central fire station on Market Street was often at "a total standstill" during cruising hours, making it impossible for the fire engines to exit the station. Kroll emphasized that "seconds, not even minutes" can be critical in controlling fires and saving lives. *Id.* at 56–58.

The plaintiffs did not seriously contest the magnitude of the congestion problem described by the city officials. Lutz himself admitted that traffic late on a weekend night could be "bumper-to-bumper," so that it might take 20 minutes to travel three blocks on Market Street within the cruising area. *Id.* at 18–20.

## II.  PROCEDURAL HISTORY

■  Initially, only Lutz challenged the ordinance. Claiming that it violated his right to travel and was overbroad, he moved for a preliminary injunction to prevent its enforcement. Following a hearing, the district court denied the preliminary injunction. The district court reasoned that Lutz was unlikely to prevail on the merits of his right to travel claim: because the freedom to cruise throughout downtown York rose "only" to the level of a "liberty interest" (as opposed to a "fundamental right"), the statute would be upheld because it was "rationally related to a legitimate governmental objective." *See Lutz v. City of York,* 692 F.Supp. 457, 459–61 (M.D.Pa.1988).[4] The district court rejected the overbreadth claim on the ground that the ordinance does not significantly infringe upon First Amendment activity. *See id.* at 461. Lutz then amended his complaint to add Weber as a second plaintiff, and the plaintiffs again sought a preliminary injunction. The district court applied the same reasoning to Weber's claims as it had to Lutz's. *See* Dist.Ct.Op. at 1–3 (Feb. 22, 1989). Instead of simply denying a preliminary injunction, however, the district court dismissed the action.[5] This appeal followed.

## III.  THE RIGHT TO TRAVEL CLAIM

### A.  *Is a Protected Right Implicated?*

Plaintiffs argue that the cruising ordinance infringes upon their right to travel, which the modern Supreme Court recognized as fundamental in *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). The leading modern travel case, however, is *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). *Shapiro* struck down on equal protection grounds a minimum durational residency requirement imposed as a condition of eligibility for welfare benefits. The Court noted that the relevant statute on its face treated some residents (new arrivals from other states) less well than other (long-time) residents solely on the basis of their having exercised the right to travel from one state to another. *See id.* at 627, 89 S.Ct. at 1327. Because that right is fundamental, the Court reasoned, "any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* government interest, is unconstitutional." *Id.* at 634, 89 S.Ct. at 1331 (emphasis in original). On the facts of the case before it, the Court held that none of the state's asserted justi-

---

**4.**  Apparently, the court considered an equal protection challenge to the ordinance *sua sponte,* under rational basis review. Assuming that it does not burden fundamental rights, the cruising ordinance, which creates no suspect classifications, easily survives equal protection scrutiny, for it is rationally related to York's legitimate objective of ensuring orderly traffic flow on its public streets. Lutz never contended otherwise, however.

**5.**  The court dismissed the action after a preliminary injunction hearing at which no issues of material fact were contested. Thus, we assume that the district court entered summary judgment *sua sponte.* Ordinarily, a court may do this only after fair warning to the losing parties to come forward with all their evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). It is unclear whether plaintiffs in this case received such notice. On appeal, however, plaintiffs raise only substantive claims; they do not contend that the dismissal unfairly prevented them from developing an adequate factual record.

fications for its minimum durational residency requirement survived the strict scrutiny test. *See id.* at 633–37, 89 S.Ct. at 1330–33.

Since *Shapiro,* virtually all of the Court's right to travel cases have involved closely analogous situations. Thus, under reasoning essentially the same as *Shapiro's,* the Court has struck down minimum durational residency requirements imposed as conditions of eligibility to vote, *see Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and to receive free nonemergency medical care, *see Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). However, discerning state interests of greater significance than those asserted in *Shapiro, Dunn,* or *Maricopa County,* the Court in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), upheld a minimum durational residency requirement as a condition of eligibility to be granted an in-state divorce.[6]

More recent cases involve similar statutes, but different reasoning. Thus, in *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), the Court reviewed a state statute distributing certain income to its citizens on the basis of the duration of each citizen's in-state residency. The Court struck down the statute under rational basis review, expressly reserving the question "whether any enhanced scrutiny is called for" because the statute burdened fundamental rights. *See id.* at 61, 102 S.Ct. at 2313. And in *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986),

Justice Brennan's reassertion of the *Shapiro* strict scrutiny test garnered only a plurality. The fifth and sixth votes for striking down the statute under consideration, which provided benefits for certain veterans only if they had been residents of New York when they entered the service, relied on the rational basis approach employed in *Zobel.*[7]

The prevalence in the modern right to travel case law of challenges to statutes facially discriminating against recent interstate immigrants has two consequences that complicate the decision at hand. First, such cases presented the Supreme Court with no opportunity squarely to consider the question whether the right to travel includes the right to travel *intra* state—a major threshold issue in this case. Dicta from the recent travel cases is largely unhelpful on this score. For example, in *Guest,* the Court at different points referred to both "the constitutional right to travel from one State to another" and the "freedom to travel throughout the United States." 383 U.S. at 757, 758, 86 S.Ct. at 1177, 1178. Similarly, *Shapiro* referred to both "the right to travel interstate" and the right "to travel throughout the … land." 394 U.S. at 629, 630, 89 S.Ct. at 1328, 1329. *Dunn* quoted the *Guest* formulation regarding " 'freedom to travel throughout the United States,' " and characterized that freedom as "includ[ing]" the right to travel interstate, 405 U.S. at 338, 92 S.Ct. at 1001, but the *Soto–Lopez* plurality spoke of "the constitutional right to travel, or, more precisely, the right of free interstate migration," 476 U.S. at 902, 106

**6.** In pointed contrast to its antecedents, *Sosna* never expressly stated that minimum durational residency requirements trigger strict scrutiny. *Sosna* did not deem any of the government interests asserted to justify the classification between new arrivals and long-time residents to be "compelling," and it seemed to water down the additional requirement that the classification be "necessary" to vindicate those interests. *See* 419 U.S. at 406, 95 S.Ct. at 560 (stating that the classification "may reasonably be justified" by the asserted state interests). However, before upholding the durational residency requirement, the *Sosna* Court did establish that it furthered state interests above and beyond the "budgetary or recordkeeping considerations" asserted in the previous cases, *see id.* at 406–08, 95

S.Ct. at 560–62, which would clearly have been sufficient to sustain a provision challenged only under rational basis review. Therefore, despite *Sosna's* evident unwillingness to impose strict scrutiny, the proposition that minimum durational residency requirements trigger some form of heightened scrutiny survived intact.

**7.** *See* 476 U.S. at 912–16, 106 S.Ct. at 2325–28 (Burger, C.J., concurring in the judgment); *id.* at 916, 106 S.Ct. at 2328 (White, J., concurring in the judgment). Justice White agreed with the three dissenters that heightened scrutiny was inappropriate in the particular case; Chief Justice Burger expressly reserved the question.

S.Ct. at 2320. *Maricopa County* strongly suggested that whether the right to travel extends to intrastate travel remained an open question at least as of 1974, *see* 415 U.S. at 255–56, 94 S.Ct. at 1080–81 ("Even were we to draw a distinction between interstate and intrastate travel, a question we do not now consider...."), and the Court has said nothing conclusive on the matter since then.[8]

Second, the Supreme Court has viewed the paradigm of facial discrimination against recent interstate immigrants as straightforward enough that it has dispensed with analysis of the appropriate textual basis in the Constitution for the unenumerated right to travel. Either the Court sees the distinction as so completely arbitrary that it strikes down the provision under a threshold rational basis review (as in *Zobel*), or it finds the right to travel obviously implicated—and scrutiny therefore heightened—regardless of whence the right to travel is derived (as in *Shapiro*).[9]

Not all right to travel opinions have eschewed the burden of locating the right to travel in some appropriate constitutional text. Various Justices at various times have suggested no fewer than seven different sources: the Article IV Privileges and Immunities Clause,[10] the Fourteenth Amendment Privileges and Immunities Clause,[11] a conception of national citizenship said to be implicit in "the structural logic of the Constitution itself," [12] the Commerce Clause,[13] the Equal Protection

---

**8.** In *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), which involved a vagueness challenge to an anti-loitering statute, the Court referred in passing to "the constitutional right to freedom of movement" potentially implicated by the statute. *Id.* at 358, 103 S.Ct. at 1859. (For the existence of this right, *Kolender* cited the case line of *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the limited utility of which we address below at 266–267.) The Court's analysis, however, focused almost exclusively on concerns of adequate notice to the citizenry and the potential for discriminatory enforcement, which the Court characterized as the "principal element[s]" of the void-for-vagueness doctrine, 461 U.S. at 357–58, 103 S.Ct. at 1858–59. In this respect, *Kolender* is similar to *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), another vagueness case. Without citation to legal authority any more conventional than a comment by a former governor, a poem by Walt Whitman, and a book by Henry David Thoreau, *Papachristou* extolled "wandering or strolling" as "part of the amenities of life as we have known them." *Id.* at 164, 92 S.Ct. at 844. However, read as a whole, the *Papachristou* opinion relies far more upon the potential for discriminatory enforcement against poor people and minorities, *id.* at 162–63, 92 S.Ct. at 843–44, "nonconformists, dissenters, [and] idlers," *id.* at 170, 92 S.Ct. at 847, and various other "so-called undesirables," *id.* at 171, 92 S.Ct. at 848, than upon the statute's potential to infringe upon a general freedom of movement. For these reasons, we conclude that *Kolender* and *Papachristou* provide at best indirect support for a right to travel that includes the kind of localized intrastate movement at issue in this case.

**9.** *See, e.g., Soto–Lopez,* 476 U.S. at 902, 106 S.Ct. at 2320 (plurality opinion) ("[I]n light of the unquestioned historic acceptance of the principle of free interstate migration ... we have not felt impelled to locate this right definitively in any particular constitutional provision."); *Shapiro,* 394 U.S. at 630, 89 S.Ct. at 1329 ("We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision."). *See also Guest,* 383 U.S. at 760, 86 S.Ct. at 1179 ("Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need to canvass these differences further. All have agreed that the right exists." (footnote omitted)).

**10.** "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states." U.S. Const. art. IV, § 2, cl. 1. *See, e.g., Zobel,* 457 U.S. at 71–81, 102 S.Ct. at 2318–24 (O'Connor, J., concurring in the judgment).

**11.** "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States...." U.S. Const. amend. XIV, § 1. *See Edwards v. California,* 314 U.S. 160, 177–81, 62 S.Ct. 164, 168–70, 86 L.Ed. 119 (1941) (Douglas, J., concurring).

**12.** Note, *Membership Has Its Privileges and Immunities: Congressional Power To Define and Enforce the Rights of National Citizenship,* 102 Harv.L.Rev. 1925, 1935 (1989). *See Crandall v. Nevada,* 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867).

**13.** "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const. art. 1, § 8, cl. 3. *See Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

Clause,[14] and each of the Due Process Clauses.[15] Needless to say, these various provisions serve quite different purposes, and quite different doctrines have developed around each. Thus, the right to travel could have dramatically different scope and coverage depending on the constitutional provision from which it is derived, and the Court recently has provided precious little guidance on which of them presently give rise to a right to travel, and the respective scopes of each.

York contends that the right to travel does not encompass the right to travel intrastate. It correctly points out that Lutz has introduced absolutely no evidence establishing a nexus between the kind of very localized travel burdened by the cruising ordinance and the right to move freely from state to state. Therefore, York concludes that the right to travel, properly construed, is not implicated in this case. York's argument thus squarely presents the question reserved in *Maricopa County*—whether the constitutional right to travel extends to localized intrastate movement. Our own precedent on this point is even less helpful than the Supreme Court's.[16]

In *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646 (2d Cir.), *cert. denied*, 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971), the only court of appeals case we know to have decided the question, the Second Circuit held that the right to travel does encompass intrastate travel. Although we ultimately agree with the Second Circuit's result, we find its reasoning somewhat underarticulated, especially in light of the travel cases decided since *King*. "It would be meaningless," the Second Circuit stated, "to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *Id.* at 648. One consequence of the Court's refusal in *Shapiro* and its progeny to ground the right to travel in particular constitutional text is that there exists some uncertainty as to whether it is, in fact, "a fundamental precept of personal liberty."

To the extent that the right to travel is an aspect of personal liberty protected by substantive due process, for example—and there is a clear line of cases cited in *Shapiro* at least suggesting that it is—the proposition asserted by the Second Circuit is unimpeachable. However, to the extent that the right to travel grows out of constitutional text animated by structural concerns of federalism—a no less implausible view under many of the Court's older major travel precedents—it might be entirely "meaningful" to suppose that the right is not implicated by reasonable restrictions on

14. "[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. *See, e.g., Zobel,* 457 U.S. at 60 n. 6, 102 S.Ct. at 2312 n. 6.

15. "[N]or [shall any person] be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V; "[N]or shall any State deprive any person of life, liberty, or property, without due process of law...."; *id.* amend. XIV, § 1. *See, e.g., Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (Fifth Amendment Due Process Clause); *Williams v. Fears,* 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186 (1900) (Fourteenth Amendment Due Process Clause).

16. We are aware of only two conceivably relevant cases. In *Wellford v. Battaglia,* 485 F.2d 1151 (3d Cir.1973) (per curiam), we struck down a provision in the Wilmington city charter prohibiting new arrivals from running for mayor, citing *Dunn* for the proposition that scrutiny should be heightened because "the five-year residency requirement interfered with the potential candidate's right to travel." *Id.* at 1152. The charter clearly burdened all recent immigrants to Wilmington from outside of Delaware relative to a subset of long-term Delaware residents (namely, long-term Wilmington residents), and thus involved a kind of discrimination against interstate travelers not present in this case. In *Hague v. Committee for Industrial Organization,* 101 F.2d 774 (3d Cir.), *modified,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), relying on both Privileges and Immunities clauses, we asserted that "[i]ndividuals coming into or going about a city upon their lawful concerns must be allowed free locomotion upon the streets and public places." *Id.* at 780. Whatever the implications of that statement considered in isolation, the Supreme Court clearly rejected it insofar as it would have expanded then-settled interpretations of both clauses, which we discuss below. *See* 307 U.S. at 511–13, 59 S.Ct. at 962–63; *infra* pp. 262–64.

localized intrastate movement. To try to resolve these questions, we now consider the various constitutional provisions that might give rise to a right of localized intrastate movement. Locating the most plausible source of the putative right to intrastate travel should at least establish a more clear framework for further analysis.

### 1. Article IV Privileges and Immunities Clause.

The right to travel was first mentioned in the federal reporters in *Corfield v. Coryell*, 6 F.Cas. 546 (C.C.E.D.Pa.1825) (No. 3230). Contrary to popular belief, its beginning was somewhat inauspicious, for *Corfield* actually *upheld* a New Jersey statute forbidding all out-of-staters from gathering certain shellfish in New Jersey waters in any vessel not owned by a New Jersey inhabitant. *See id.* at 548, 552.[17] If *Corfield*'s holding was soon forgotten, *Corfield*'s dicta—still sometimes quoted in the post-*Shapiro* age—was not. Expounding on the content of the Article IV Privileges and Immunities Clause, Justice Washington (riding circuit) wrote as follows:

> The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. .... *The right of a citizen of one*

> *state to pass through, or to reside in, any other state*, for purposes of trade, agriculture, professional pursuits, or otherwise ... may be mentioned as [one] of the particular privileges and immunities of citizens, which [is] clearly embraced by the general description of privileges deemed to be fundamental....

*Id.* at 551–52 (emphasis added).

■ To modern readers, it certainly appears that *Corfield* envisioned the clause as a source of implied fundamental rights. However, in *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1868), the Court held that the Article IV Privileges and Immunities clause embodied not a source of implied fundamental rights, but a federalism-based antidiscrimination principle.

> It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned....

> ....

> But the privileges and immunities secured to citizens of each State in the several States, by the provision in question, are those privileges and immunities which are common to the citizens in the latter States under their constitution and laws by virtue of their being citizens. Special privileges enjoyed by citizens in their own States are not secured in other states by this provision.

*Id.* at 180. Subsequent cases have uniformly confirmed this view: the purpose of the clause was simply "to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948).[18] It therefore provides a plau-

---

**17.** To reach this surprising result, *Corfield* analogized fishing waters to property and the state to a propertyholder, with the incident right to exclude at will. *See* 6 F.Cas. at 552. This reasoning is less dated than might appear at first glance, for a similarly sharp distinction between the state as a monopolistic wielder of coercive power and the state as a bearer of common-law rights and duties survives to this day—at least in the realm of contract—under the market participant doctrine. *See, e.g., Swin*

*Resource Sys. v. Lycoming County*, 883 F.2d 245 (3d Cir.1989).

**18.** *See also, e.g., Hague v. Committee for Indus. Org.*, 307 U.S. 496, 511, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939) ("[The clause] does not import that a citizen of one state carries with him into another fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the state first mentioned, but, on the contrary, that in any

sible textual basis for the *Shapiro* case line, as Justice O'Connor has recently suggested,[19] but is simply inapplicable here. The cruising ordinance restricts certain travel by in-staters and out-of-staters identically—travel that involves driving repeatedly around the same localized area within a state. To the extent that the right to travel grows out of the Article IV Privileges and Immunities clause, plaintiffs' claim is without merit.

### 2. Fourteenth Amendment Privileges and Immunities Clause.

In *The Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), the Court made clear that the Fourteenth Amendment did not incorporate the substantive rights deemed "fundamental" by Justice Washington in *Corfield*.

[With few, textually grounded exceptions,] the entire domain of the privileges and immunities of citizens of the States [as defined in *Corfield*] lay within the constitutional and legislative power of the States, and without that of the Federal government. Was it the purpose of the fourteenth amendment, by the simple declaration that no State should make or enforce any law which shall abridge the privileges and immunities of *citizens of the United States*, to transfer the security and protection of all the civil rights which we have mentioned, from the States to the Federal government? And where it is declared that Congress shall have the power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the states?

. . . .

We are convinced that no such results were intended by the Congress which proposed these amendments, nor by the legislatures of the States which ratified them.

[T]he privileges and immunities relied on ... are those which belong to citizens of the States as such, and ... are left to the State governments for security and protection, and not by this article placed under the special care of the Federal government....

*Id.* at 77–78 (emphasis in original). Moreover, the Court made clear that the *only* rights protected by the Fourteenth Amendment Privileges and Immunities Clause are those "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.* at 79.

In a series of late nineteenth century cases, the Court recognized several unenumerated rights it deemed essential "attribute[s] of national citizenship." *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L.Ed. 588 (1876).[20] Even though the Fourteenth Amendment Privileges and Immunities Clause on its face protects such rights against state infringement, the Court has always viewed the rights themselves as arising independently of the Fourteenth Amendment. Indeed the doctrine that certain unenumerated rights are implicit in the concept of national citizenship antedated the ratification of the Fourteenth Amendment.[21] Even after its passage, however, this case line refused to subsume national citizenship rights under the Fourteenth Amendment, holding instead that they "do[ ] not depend upon any of the amend-

state every citizen of any other state is to have the same privileges and immunities which the citizens of that state enjoy. The section, in effect, prevents a state from discriminating against citizens of other states in favor of its own.").

**19.** *See Zobel*, 457 U.S. at 71–81, 102 S.Ct. at 2318–24 (O'Connor, J., concurring in the judgment).

**20.** The most prominent of these cases included: *In re Quarles*, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895) (right to inform federal officials of violations of federal law); *Logan v.*

*United States*, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (right to be free from violence while in custody of federal marshal); *United States v. Waddell*, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884) (right to homestead); *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884) (right to vote in national elections); *Cruikshank*, 92 U.S. 542 (right to petition Congress); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867) (right to travel) (discussed below at pp. 264–65).

**21.** The Fourteenth Amendment was ratified in 1868, one year after *Crandall* was decided.

ments to the Constitution, but arise[ ] out of the creation and establishment of the Constitution itself of a national government." *In re Quarles,* 158 U.S. 532, 536, 15 S.Ct. 959, 961, 39 L.Ed. 1080 (1895).

At first blush, insisting that the rights of national citizenship are protected, but not created, by the Fourteenth Amendment Privileges and Immunities Clause may seem like a quibble, but the distinction has critical doctrinal ramifications in other contexts. For example, rights created by the Fourteenth Amendment itself can be infringed only by state actors, while the rights of national citizenship recognized in this case line may be infringed by purely private actors as well. *See Guest,* 383 U.S. at 759 n. 17, 86 S.Ct. at 1178 n. 17; *id.* at 771–73, 86 S.Ct. at 1185–86 (Harlan, J., dissenting).[22]

■ As the Court grew increasingly willing to discover unenumerated rights within the Fourteenth Amendment itself in the decades following *Slaughter–House,* it relied exclusively on the Due Process Clause.[23] Plaintiffs therefore cannot rely on the Fourteenth Amendment Privileges and Immunities Clause, which has remained essentially moribund since *Slaughter–House,* as the source of an implied fundamental right of intrastate travel.

### 3. Rights of National Citizenship.

In *Crandall v. Nevada,* 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867), the Court struck down an egress tax Nevada had imposed on all persons leaving the state by railroad. In so doing, it held that the right to travel was an essential attribute of national citizenship. The Court reasoned as follows:

> The People of these United States constitute one nation. They have a government in which all of them are deeply interested. This government has necessarily a capital established by law, where its principal operations are conducted.... That government has a right to call to this point any or all of its citizens to aid in its service, as members of the Congress, of the courts, of the executive departments, and to fill all its other offices; and this right cannot be made to depend upon the pleasure of a State over whose territory they must pass to reach the point where these services must be rendered. The government, also, has its offices of secondary importance in all other parts of the country.... In all these it demands the services of its citizens, and is entitled to bring them to those points from all quarters of the nation, and no power can exist in a State to obstruct this right that would not enable it to defeat the purposes for which the government was established.
>
> ....
>
> But if the government has these rights on her own account, the citizen also has correlative rights. He has the right to come to the seat of government to assert any claim he may have upon that government, or to transact any business he may have with it. To seek its protection, to share its offices, to engage in administering functions.... [T]his right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it.

*Id.* at 43–44. *Crandall,* therefore, recognized a right to travel insofar as travel is necessary for the transaction of business between the national government and its citizenry.

Although Justice Douglas[24] and some commentators[25] have argued for extending

---

**22.** Presumably, these rights of national citizenship were protected against state infringement since the beginning of the Republic under the Supremacy Clause, U.S. Const. art. VI, § 2. Thus Justice Field's charge that *Slaughter–House,* by refusing to federalize the protection of any of the state-created citizenship rights listed in *Corfield,* rendered the Fourteenth Amendment Privileges and Immunities Clause "a vain and idle enactment, which accomplished nothing." *Slaughter–House,* 83 U.S. (16 Wall.) at 96 (Field, J., dissenting).

**23.** *Compare Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Due Process Clause protects the freedom of contract) *with Slaughter–House,* 83 U.S. (16 Wall.) at 76–77 (Privileges and Immunities Clause does not protect the unenumerated rights listed in *Corfield* ).

**24.** *See Edwards v. California,* 314 U.S. at 178, 62 S.Ct. at 169 (Douglas, J., concurring).

**25.** *See, e.g.,* Note, *supra* note 12, at 1935.

*Crandall* into a generalized right of free movement throughout the United States, the Court has declined to do so. *See, e.g., United States v. Wheeler,* 254 U.S. 281, 299, 41 S.Ct. 133, 136, 65 L.Ed. 270 (1920) (distinguishing *Crandall* in part on the ground that "the state statute considered in that case was held to directly burden the performance by the United States of its governmental functions and also to limit rights of the citizens growing out of such functions").

■ Plainly, the right to travel as recognized in *Crandall* is not implicated by the cruising ordinance. Lutz can proceed unimpeded by law (once he makes his way through the traffic jams on Philadelphia and Market Streets) to any federal installation at which he is called upon to exercise the various rights and duties of citizenship.[26]

## 4. Commerce Clause.

■ The last right to travel case to employ Commerce Clause analysis was *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). Invoking the implied preemptive effect of the Clause on state action, *Edwards* struck down a state statute making it a misdemeanor to help indigent nonresidents enter the state. *Edwards* thus involved a statute prohibiting the importation of "goods"[27] perceived to produce unwanted local burdens. Under current Commerce Clause doctrine, this is virtually per se unconstitutional. *See, e.g., City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Here, by contrast, York's ordi-nance is facially neutral as to interstate commerce, and imposes no threat of burdening the stream of commerce with conflicting regulation. The appropriate inquiry, therefore, is whether the burden that the ordinance imposes on interstate commerce "is clearly excessive in relation to [its] putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The benefits of the cruising ordinance, as described by city officials at the preliminary injunction hearing, are significant, and the burdens it imposes on interstate commerce are obviously negligible. Therefore, any right to travel argument in this case based on the Commerce Clause is frivolous.

## 5. Equal Protection.

*Shapiro* and its progeny are Equal Protection cases in the sense that they involved classifications that were suspect because they penalized a group of people on the basis of their having exercised a constitutionally protected right to travel. That is not to say, however, that the right to travel itself necessarily arises under the Equal Protection Clause.[28]

■ Ordinarily, the Equal Protection Clause prohibits certain forms of invidious discrimination, but does not create substantive rights. The few exceptions to this rule almost all involve a kind of synergism between some unenumerated right that the Court deems important (but not so important that its evenhanded denial would be forbidden) and some classification that the Court deems suspect (but not so suspect as to require heightened scrutiny in all contexts).[29] The cruising ordinance, however,

26. York was the capital of the United States between September 1777 and June 1778. *See 29 Encyclopaedia Americana* 643 (1954). Presumably, the Continental Congress moved away for reasons other than excessive local traffic.

27. "[I]t is settled beyond question that the transportation of persons is 'commerce'...." 314 U.S. at 172, 62 S.Ct. at 166.

28. *Compare, e.g., Police Dep't v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (striking down, on Equal Protection grounds, an ordi-nance infringing upon the First Amendment rights of some, but not all, picketers).

29. The leading case is *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), which struck down a statute allowing the sterilization of habitual larcenists, but not habitual embezzlers. The *Skinner* opinion emphasized both the importance of the right to bear children, *see, e.g., id.* at 541, 62 S.Ct. at 1113 ("We are dealing here with legislation which involves one of the basic civil rights of man."), and the invidiousness that the Court perceived in the supposed class-based distinction between larcen-

creates no such suspect or quasi-suspect classifications. Thus, if cruising is to be deemed constitutionally protected activity, the source of that protection cannot be the Equal Protection Clause itself.

### 6. Substantive Due Process.

A few very old cases contain dicta suggesting that the right to localized intrastate travel is substantively protected by the Fourteenth Amendment Due Process Clause. The clearest of these is *Williams v. Fears*, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900), in which the Court commented that "the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of liberty ... secured by the 14th amendment." *Id.* at 274, 21 S.Ct. at 129. It is unclear whether the travel aspect of cases like *Fears* can be severed from the general spirit of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), now thoroughly discredited, that was so prominent in substantive due process analysis of that period. For example, *Fears* itself (in the sentence immediately following the one quote above) continues: "And so as to the right to contract." *Id.* It seems uncertain, therefore, whether these old cases have significant continuing precedential value.

Another line of cases suggesting Due Process protection for the right to travel grew out of the federal government's attempts in the 1950's and 1960's to deny passports to Communists. In *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court stated that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Id.* at 125, 78 S.Ct. at 1118. Because of the Fifth Amendment values at stake, the Court construed an arguably ambiguous statute not to confer on the Secretary of State "unbridled discretion" to decide whether or not to grant passports to Communists. *Id.* at 129, 78 S.Ct. at 1119. The Court noted, however, an additional First Amendment concern lurking in the case—the conditioning of a passport on the abandonment of protected speech and association. *See id.* at 130, 78 S.Ct. at 1120. In *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), a similar case decided on constitutional grounds, the First Amendment seemed to play a more central role in the Court's analysis. "Since freedom of association is itself guaranteed in the First Amendment, restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association." *Id.* at 507, 84 S.Ct. at 1664 (footnote omitted).

Subsequent cases upholding restrictions on the right to travel abroad make it difficult to infer a general Due Process right of localized intrastate movement from *Kent*. In *Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), the Court drew a sharp distinction between "the *freedom*

---

ists and embezzlers, *see, e.g., id.* ("When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment."). The Court could not rely entirely on the former because it was unwilling to disturb then-governing precedent, *see Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), to the effect that inmates found to be hereditary imbeciles could be sterilized. Some of the Court's later so-called substantive equal protection cases fit comfortably within the *Skinner* paradigm. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 223, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) (striking down a statute denying education to children of undocumented aliens, although conceding that a state-sponsored education is not a fundamental right and that undocumented aliens are not a suspect class). Others involve a close variation—important rights (which might be denied evenhandedly) that are disproportionately denied to the poor by facially neutral monetary charges (which are not generally suspect). *See, e.g., Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665–66, 86 S.Ct. 1079, 1080–81, 16 L.Ed.2d 169 (1966) (striking down poll taxes on Equal Protection grounds, but reserving the question whether the Constitution guarantees the right to vote in state elections); *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956) (plurality opinion) (requiring states to furnish indigent criminal defendants with free trial transcripts on appeal, although conceding that states may eliminate a right to appeal altogether).

to travel outside the United States" at issue in *Kent*, which it characterized as "no more than an aspect of the 'liberty' protected by the Due Process clause," and "the *right* to travel within the United States," which it characterized as "[t]he constitutional right to interstate travel," citing cases all of which fall squarely within one or another of the case lines already discussed. *See id.* at 306–07, 101 S.Ct. at 2781–82 (emphases in original). Moreover, in *Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), the Court suggested that *Kent* and *Aptheker* should be viewed as "controlled" primarily by First Amendment concerns, *see id.* at 241–42, 104 S.Ct. at 3037–38, which are not implicated by ordinances restricting the travel of everyone, not just of those who utter unpopular speech or associate with disapproved groups.

In light of these various case lines, we conclude that no constitutional text other than the Due Process Clauses could possibly create a right of localized intrastate movement, and no substantive due process case since the demise of *Lochner* has considered whether the clause in fact does create such a right. The question, therefore, is whether or not we can fairly derive a right of localized intrastate movement from the general principles of modern substantive due process analysis. Unfortunately, the Supreme Court's precedents take us no farther than that.

■ The test usually articulated for determining fundamentality under the Due Process Clause is that the putative right must be "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), or "deeply rooted in this Nation's

history and tradition," *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion). Modern substantive due process cases almost all cluster around decisions involving family matters[30] or procreative decisions.[31] The right to travel does not fit comfortably within this range of decisions, and the Supreme Court has recently expressed some discomfort with substantive due process generally, explaining that the touchstone phrases from *Palko* and *Moore* cannot be read too broadly, because "[t]he Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Bowers v. Hardwick*, 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986). We nonetheless reject York's argument that the Due Process Clause does not substantively protect a right to intrastate travel.

We acknowledge that academic arguments have been advanced for abandoning the doctrine of substantive due process altogether, either because the Due Process Clause on its face seems to regulate only matters of procedure[32] or because any doctrine of implied fundamental rights arguably intrudes upon the majoritarian processes by which a democratic society governs itself.[33] Nonetheless, despite the *Bowers* Court's general cautionary note and despite some Justices' apparent hostility towards particular substantive due process decisions,[34] no sitting Justice has suggested abandoning the doctrine in its entirety.

The narrowest conception of substantive due process articulated in recent years was advanced by Justice Scalia in *Michael H. v. Gerald D.*, —— U.S. ——, 109 S.Ct. 2333,

---

**30.** *See, e.g., Moore*, 431 U.S. 494, 97 S.Ct. 1932 (extended family living together); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (religious upbringing of children).

**31.** *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (use of contraceptives).

**32.** *See, e.g.,* J. Ely, *Democracy and Distrust: A Theory of Judicial Review* 14–21 (1980).

**33.** *See, e.g.,* R. Bork, *The Tempting of America: The Political Seduction of the Law* 110–26 (1989).

**34.** *See, e.g., Webster v. Reproductive Health Servs.*, —— U.S. ——, 109 S.Ct. 3040, 3055–58, 106 L.Ed.2d 410 (1989) (plurality opinion) (criticizing *Roe v. Wade* and certain of its progeny); *id.* 109 S.Ct. at 3064–67 (Scalia, J., concurring in the judgment) (arguing that *Roe* should be overruled).

105 L.Ed.2d 91 (1989). Justice Scalia expressly endorsed the well-settled proposition that the Due Process Clause substantively protects unenumerated rights " 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Id.,* 109 S.Ct. at 2341 (plurality opinion) (citation omitted). However, he argued further that the relevant traditions must be identified and evaluated at the most specific level of generality possible. *See id.* at 2344 n. 6. The limiting function of this additional requirement is evident from the recent caselaw: for example, a recognized tradition of marital intimacy could not be generalized into a tradition of sexual freedom, from which could be derived a right to engage in homosexual sodomy—a tradition which, stated at that level of specificity—has not enjoyed deeply rooted acceptance in our Nation's history. *Compare Griswold,* 381 U.S. at 481–86, 85 S.Ct. at 1679–83 (recognizing an implied fundamental right of marital intimacy) *with Bowers,* 478 U.S. at 190–94, 106 S.Ct. 2843–46 (refusing to recognize an implied fundamental right to engage in homosexual sodomy).

Solely for purposes of this appeal, we adopt Justice Scalia's view, not because it represents the views of the Court,[35] but because if a fundamental right of intrastate travel can be recognized under a view of substantive due process expressly rejected by a majority of the Court as unduly *narrow,* then clearly we will not have overextended the doctrine by so doing.

The right or tradition we consider may be described as the right to travel locally through public spaces and roadways. Under York's view, a state or local government could constitutionally prohibit all freedom of movement that does not involve interstate migration, interstate commerce, business between a citizen and the federal government, and (presumably) travel incident to otherwise protected activity. Conceivably this result could be made less implausible by attempting to distinguish a more particularized, protected tradition of travel or wandering on foot, as hinted at in *Papachristou, see supra* note 8, from an unprotected tradition of localized travel by automobile. But accepting that distinction would imply the constitutionality of the limited travel ban described above, enforced exclusively by state control of the public roadways. It would permit, for example, the prohibition of simply "going for a ride" through one's neighborhood, so long as the prohibition could be effected without burdening the protected forms of travel and justified by any legitimate state purpose it conceivably furthered—for example, conserving gasoline—so as to survive the forgiving requirements of rational basis review.

We conclude that the right to move freely about one's neighborhood or town, even by automobile, is indeed "implicit in the concept of ordered liberty" and "deeply rooted in the Nation's history." Despite our preceding analysis, this bottom-line judgment is unquestionably ad hoc, to some extent. However, unless the Supreme Court either repudiates substantive due process altogether (an unlikely prospect), decides the question left open in *Maricopa County,* or limits substantive due process analysis to more specific fact patterns—in other words, limits substantive due process rights to "a series of isolated points," not the "rational continuum" [36] suggested by the ringing general phrases still quoted from cases like *Palko* and *Moore*—it is a judgment we are required to make.

### B. *Setting a Standard of Review*

Conceived of as an individual, Due Process right to move freely about one's neighborhood, the right to travel is clearly burdened by the cruising ordinance. Plaintiffs' argument regarding an appropriate standard of review is simple—statutes that burden constitutionally protected rights survive only to the extent that they are no more restrictive than necessary to achieve compelling state interests. This basic formulation of the strict scrutiny test has

---

**35.** Only Chief Justice Rehnquist endorsed the view set out in footnote 6 of the plurality opinion.

**36.** *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

been routinely applied in substantive due process cases [37] as well as in *Shapiro* and certain of its progeny.

Plaintiffs assert, convincingly, that the ordinance cannot survive strict scrutiny. Although York's asserted interests—ensuring public safety and reducing unwanted congestion, noise and pollution—are surely important, and can probably be deemed compelling, the tailoring of the ordinance would be problematic. As the plaintiffs point out, the city has offered no specific evidence why the ordinance must extend to weekday nights, or why its interests could not be vindicated by other less restrictive alternatives—for example, enforcing existing traffic laws, which among other things prohibit stopping during green lights, as cruisers evidently do, *see* App. at 52. Thus, were we to employ *least* restrictive analysis, as required by the traditional strict scrutiny test, we agree with the plaintiffs that the ordinance could not survive.

██ Not every governmental burden on fundamental rights must survive strict scrutiny, however. We believe that reviewing all infringements on the right to travel under strict scrutiny is just as inappropriate as applying no heightened scrutiny to any infringement on the right to travel not implicating the structural or federalism-based concerns of the more well-established precedents. For this conclusion, we rely heavily on the time, place and manner doctrine so firmly entrenched in the jurisprudence of free speech.

The doctrine allows intermediate scrutiny—not strict—of certain time, place and manner restrictions on speech. Thus, in regulating speech in traditional public fora, a state may impose content-neutral time, place and manner restrictions that are narrowly tailored to serve significant government interests—not necessarily compelling ones—while leaving open ample alternative channels of communication. *See, e.g., Clark v. Community for Creative Non-*

*Violence,* 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984). Moreover, the tailoring requirement in this context does not require the state to employ the *least* restrictive means of achieving its end, as it would under full-blown strict scrutiny. *See, e.g., Board of Trustees v. Fox,* —— U.S. ——, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989).

The freedom of speech is expressly enumerated in the Bill of Rights itself, and the Court, citing the "transcendent value to all society of constitutionally protected expression," [38] often creates for it especially protective doctrines that could be—but are not—applied to protected rights generally.[39] Nonetheless, the time, place and manner doctrine allows certain restrictions on speech to survive under less than fully strict scrutiny. If the freedom of speech itself can be so qualified, then surely the unenumerated right of localized travel can be as well.

The concerns underlying York's cruising ordinance seem to us highly analogous to the concerns that drive the time, place and manner doctrine: just as the right to speak cannot conceivably imply the right to speak whenever, wherever and however one pleases—even in public fora specifically used for public speech—so too the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases—even on roads specifically designed for public travel. Unlimited access to public fora or roadways would result not in maximizing individuals' opportunity to engage in protected activity, but chaos. To prevent that, state and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of speech and travel. Therefore, in order to set out a workable jurisprudence for the newly recognized due process right of localized movement on the public roadways, we find it appropriate to borrow from the well-settled, highly analogous rules the Court has developed in the

---

**37.** *See, e.g., Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 727 (collecting cases).

**38.** *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972).

**39.** Two examples are the First Amendment overbreadth doctrine, *see infra* Part IV, and a modern-day version of the otherwise generally defunct constitutional fact doctrine, *see, e.g., Bose Corp. v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

free speech context. The cruising ordinance will be subjected to intermediate scrutiny, and will be upheld if it is narrowly tailored to meet significant city objectives.[40] We now apply this standard to the ordinance.[41]

## C. *Application*

■ We believe that the cruising ordinance passes muster as a reasonable time, place and manner restriction on the right of localized intrastate travel. York's interests in ensuring public safety and reducing the significant congestion caused by cruising are plainly significant. The ordinance is limited in its scope to locations undisputedly affected by the current cruising problem, and it leaves open ample alternative routes to get about town without difficulty. It prohibits only certain repetitive driving around the loop, and it prohibits no one from driving outside the loop, or from driving to the loop and then walking anywhere inside the loop—a distance no more than several blocks. Under these circumstances, we conclude that the ordinance is narrowly tailored to combatting the safety and congestion problems identified by the city.

Plaintiffs respond, however, that the ordinance is not as narrowly drawn as it might have been. For example, it operates on weekday nights, when cruising appears to be significantly less of a problem than it is over the weekend. Nonetheless, the city represented to us its concern that a statute operating only on weekend nights would simply shift the problems associated with cruising to weekday nights—especially in the summertime. It stands to reason that some such shifting would have occurred, but also that the alternative problem of weekday cruising under a more narrowly tailored ordinance would be less severe than the old problem of weekend cruising before passage of the ordinance. Exactly how much less severe is irrelevant under the circumstances because the city need only write a narrowly tailored ordinance, not the *least* restrictive ordinance. Because it has done so, the cruising ordinance must be upheld.

## IV. THE OVERBREADTH CLAIM

■ Analysis of the plaintiffs' overbreadth claim is much simpler: the over-

**40.** Only content-neutral restrictions are subjected to intermediate scrutiny in the public fora cases. Content-specific restrictions, by contrast, must survive strict scrutiny. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The requirement of content-neutrality in the speech context has no obvious analog in the travel context. Its basic purpose is to prevent a kind of discrimination among speakers that is antithetical to the underlying First Amendment values. Because we can discern no invidious distinctions among travelers in the cruising ordinance, we find its restrictions on travel more closely analogous to a content-neutral, not a content-specific, restriction on speech in a public forum.

**41.** The First Amendment analogy also helps us to emphasize the narrowness of our holding in two respects necessary to prevent absurd results from following. First, not every "burden" on First Amendment rights is sufficiently serious to trigger heightened scrutiny. "[I]f the impact of a regulation on protected speech is comparable to the sound made by the proverbial tree falling in an unpopulated forest, there is no event to trigger First Amendment analysis." *Fabulous Assocs., Inc. v. Pennsylvania Pub. Util. Comm'n*, 896 F.2d 780, 785 (3d Cir.1990). So too with the right of intrastate travel. York characterizes the cruising ordinance as merely a traffic regu-

lation. We apply heightened scrutiny to it only because we conclude that *this* traffic regulation, unlike most, does impose nontrivial burdens on travel. Nothing we say today suggests that more conventional traffic regulations such as speed limits, stop signs, and the like need now be subjected to heightened judicial scrutiny.

Second, heightened scrutiny of time, place and manner restrictions is appropriate only in fora traditionally used or specifically created for public speech. *See, e.g., Perry*, 460 U.S. at 46, 103 S.Ct. at 955. A much more deferential analysis is appropriate for restrictions on speech in nonpublic fora, because " 'the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) (citation omitted). Similar reasoning is appropriate here. The cruising ordinance merits heightened scrutiny only because it significantly restricts free movement on public roadways traditionally used for that purpose. We do not suggest that restrictions on access to government property generally must be subjected to heightened scrutiny on the theory that a citizen enjoys a right to "wander" or "travel" through the government's property.

breadth doctrine has never been recognized outside the context of the First Amendment, and plaintiffs have raised no First Amendment issues on appeal.

The overbreadth doctrine allows a litigant to argue that a statute reaching a substantial amount of protected activity should be struck down in its entirety, even if the statute could constitutionally be applied to the litigant. *See, e.g., Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972). Thus, overbreadth is a kind of exception to the prudential rule against third-party standing—in effect, it allows a party to assert the constitutional rights of others not before the court. The basic theory is that others might be deterred (or at least delayed) from engaging in protected activity if faced with the Hobson's choice of having to seek anticipatory relief before engaging in the activity or engaging in the activity and asserting a constitutional defense in any subsequent enforcement proceeding. *See, e.g., Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 798–801, 104 S.Ct. 2118, 2125–27, 80 L.Ed.2d 772 (1984).

Nothing in the basic logic of the doctrine is specific to the First Amendment. In principle, an argument could be made for allowing facial challenges based on overbreadth to statutes that reach any kind of protected activity. However, because striking down a statute in its entirety, even if it has constitutional applications, is such a strong remedy, the doctrine is a "narrow" one generally disfavored. *See New York State Club Association v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988). It is allowed in the First Amendment context only because of "the transcendent value to all society of constitutionally protected expression," *Gooding,* 405 U.S. at 521, 92 S.Ct. at 1105, and has never been recognized outside the First Amendment context. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

Because plaintiffs have abandoned their only First Amendment claim before pressing this appeal, we need not consider their overbreadth challenge any further.

## V. CONCLUSION

Plaintiffs' right to travel and overbreadth challenges to the cruising ordinance are without merit. The judgment of the district court will be affirmed.