Samantha CHAMPAGNE

v.

Steven GINTICK; H.N.S. Management Company, Inc.; the City of Hartford; Jessie Blardo, in his individual and official capacities; Deborah Nolan; and James Thomas, State's Attorney for the Hartford/New Britain Judicial District, in his official capacity.

Civ. No. 3:94CV–29 (JAC).

United States District Court, D.. Connecticut.

Aug. 8, 1994.

Jon L. Schoenhorn, Hartford, CT, for plaintiff.

Evans Jacobs, Jr., Hartford, CT, for defendants City of Hartford and Jessie Blardo.

Hugh F. Murray, III, Hartford, CT, for defendant H.N.S. Management.

Rita Margaret Shair, Wallingford, CT, for defendant James E. Thomas.

Nicholas W. Francis, Elmwood, CT, for defendants Steven Gintick and Deborah Nolan.

Gregory T. D'Auria, Hartford, CT, for intervenor, State of Conn.

## RULING ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

JOSÉ A. CABRANES, Circuit Judge: *

The question presented is whether the plaintiff, Samantha Champagne, a resident of Connecticut, will suffer irreparable harm in the absence of an injunction preventing the Hartford Police from enforcing Connecticut's "stalking" law, Conn.Gen.Stat. § 53a–181d,[1] against her.

---

* Of the United States Court of Appeals for the Second Circuit, sitting by designation.

1. This provision prohibits stalking in the second degree, a Class A misdemeanor which carries a maximum penalty of 1 year imprisonment or a fine of $2,000, or both. It provides:

   (a) A person is guilty of stalking in the second degree when with intent to cause another person to fear for his physical safety, he wilfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety.

   Conn.Gen.Stat. § 53a–181c prohibits stalking in the first degree, a Class D felony which carries a maximum penalty of one to five years imprisonment or a fine of $5,000, or both. It provides:

   (a) A person is guilty of stalking in the first degree when he commits stalking in the second degree as provided in section 53a–181d and (1) he has previously been convicted of this section or section 53a–181d, or (2) such conduct violates a court order in effect at the time of the offense, or (3) the other person is under sixteen years of age.

   Stalking in the first degree is not at issue in the instant case.

   California was the first state to pass a law prohibiting stalking in 1990. Forty-eight states and the District of Columbia have since followed suit. See M. Katherine Boychuk, Are Stalking Laws Unconstitutionally Vague or Overbroad?, 88 Nw.U.L.REV. 769, 769–770 (1994).

This is an action pursuant to 42 U.S.C. §§ 1983 and 1988 against a public bus management company, one of its bus drivers (Steven Gintick), a police officer (Jessie Blardo), the City of Hartford, and the State's Attorney for the Hartford/New Britain District (James Thomas). The plaintiff alleges that she was deprived of her First, Fourth, and Fourteenth Amendment rights and those guaranteed by Article IV, Section 2, of the Constitution as a result of her arrest pursuant to Conn.Gen.Stat. § 53a–181d. The plaintiff has also asserted a series of supplemental state law claims. Pending before the court is the plaintiff's Motion For Preliminary Injunction (filed January 10, 1994).[2]

## FINDINGS OF FACT

The plaintiff met defendant Gintick approximately six years ago. After becoming acquainted, the plaintiff began accompanying Gintick on his afternoon bus routes on a virtually daily basis. Tr. 45, 399.

Gintick invited the plaintiff to move into his home in January 1993, after his wife left him. While she lived with defendant Gintick, the plaintiff looked after Gintick's children and performed a variety of household chores. Their relationship was an intimate one. Tr. 42, 45, 46, 175, 176. The court finds Gintick's protestations otherwise to lack credibility. Tr. 473–474.

Gintick requested that plaintiff leave his home in July 1993 and called the police to remove her. At that time, Gintick had begun a romantic relationship with defendant Deborah Nolan. Gintick's new relationship upset the plaintiff, and she concedes that she "hated" him for forcing her to move out. Tr. 47, 163, 164, 185, 444–447.

Shortly after she was forced out, the plaintiff began appearing at Gintick's stops on his bus routes at several locations several times a day. On some occasions she made threatening gestures toward Gintick. Tr. 445–447, 395–397, 401, 449–450.

The plaintiff's repeated appearances disturbed Gintick and led him on at least one occasion in mid-August to leave his bus and confront the plaintiff. On this occasion Gin-

tick grabbed her wrist and told her to stay out of the downtown Hartford area. Tr. 48–51. Gintick told the plaintiff that he would have her arrested if she boarded his bus. Tr. 51.

The plaintiff testified that the reasons she is in downtown Hartford so often are to visit friends and to help out at a shoe store. Tr. 43–45. The court finds this testimony unpersuasive as an explanation for her repeated appearances at Gintick's bus stops, including ones outside the downtown Hartford area. Tr. 397–399, 400–401, 449–450.

The plaintiff contacted the Connecticut Civil Liberties Union because she feared she would be arrested if she boarded any Connecticut Transit Bus. The plaintiff subsequently boarded Gintick's bus and sat close behind him. Tr. 51–54. Gintick credibly testified that this action, together with the plaintiff's repeated appearances at his bus stops and her threatening gestures, made him fear for his safety. Tr. 400–405, 449–450.

In September 1993, Gintick changed his route in order to avoid the plaintiff. But prior to beginning the new route, the plaintiff approached Gintick in front of the Civic Center and informed him that she knew his new route and intended to "see [him] there." Tr. 415–416.

Gintick discussed plaintiff's pattern of appearances at his bus stops with Connecticut Transit officials and counsel, who advised him to file a complaint against the plaintiff with the Hartford Police Department. Tr. 500, 506–507.

Gintick filed a complaint with the Hartford Police on September 19 or 20, 1993, reporting the pattern of appearances since July and predicting to defendant Officer Blardo that the plaintiff would be at his bus stop at 2:55 p.m. on September 20, 1993. Nolan alleged that the plaintiff had been harassing and stalking her as well. Tr. 329, 341–342, 381, 417–419.

Blardo decided to be at Gintick's bus stop in downtown Hartford at 2:55 p.m. to determine whether the plaintiff was in fact stalk-

---

**2.** An evidentiary hearing on this motion was held on February 28 and March 1, 10, 11, 1994.

ing Gintick as he alleged. Blardo chose not to apply for an arrest warrant after hearing Gintick's complaint because previous applications in other stalking cases had been denied, and he believed it would be necessary to establish probable cause himself. Tr. 330–331, 345, 351. The plaintiff was, in fact, at Gintick's bus stop at 2:55 p.m. Tr. 331–333. Blardo identified himself as a Hartford Police Officer, informed the plaintiff of Gintick's complaint, and warned her to stop stalking Gintick. Tr. 332–334. At this time, Nolan emerged from a downtown office building to see what was happening. Upon seeing Nolan, the plaintiff became unruly and shouted obscenities at Blardo and Nolan. Blardo decided to arrest the plaintiff because he believed that she posed a threat to Nolan and Gintick, as well as to the general public. Tr. 335–337.

Charges against the plaintiff under Conn. Gen.Stat. § 53a–181d (stalking in the second degree) were dismissed by the State on October 27, 1993. Tr. 101; Pl.Ex. 9.

Connecticut Transit officials held a meeting following allegations by the plaintiff that Gintick was leaving his bus and harassing her. It was decided that Alcides Ortiz, a Connecticut Transit official, would "monitor" Gintick. Tr. 277–278. During the course of his investigation, Ortiz never observed Gintick exit his bus or threaten the plaintiff. Ortiz witnessed the plaintiff at Gintick's bus stops several times per day, making gestures toward Gintick some five to ten times. Ortiz concluded that the plaintiff's allegations were false. Tr. 245, 247, 248, 270, 271–273, 281–86. Ortiz's testimony was generally persuasive.

Subsequent to her arrest, the plaintiff began to keep a written record of her daily activities in downtown Hartford in order to justify her presence there at various times during the day. Tr. 102–103; Affidavit of Plaintiff (executed January 6, 1994), ¶ 24.

The plaintiff continued to follow and take pictures of Gintick after her arrest, prompting Gintick on or about October 1, 1993, to obtain an *ex parte* restraining order from the Connecticut Superior Court prohibiting the plaintiff from threatening, assaulting, or at-

tacking Gintick or Nolan. Tr. 404–406, 479, Pl.Ex. 7.

Gintick dropped his civil action about three weeks later, finding himself unable to help enforce the restraining order because of the need to drive his route in a timely manner. Tr. 100–101, 450–451.

On January 12, 1994, confronted again by the appearance of the plaintiff, Gintick exited his bus and allegedly threatened to "get" her. The plaintiff telephoned the Hartford Police for assistance and informed Officer Serge Khuzkhian that Gintick had threatened to kill her. Tr. 23, 110–113.

Officer Khuzkhian decided to speak with Gintick and told him to stay away from the plaintiff. Gintick told the officer that it was the plaintiff who was harassing him. The officer was unable to substantiate the plaintiff's claim. Tr. 26, 27, 30, 35, 39, 40.

The plaintiff testified that Gintick left his bus and threatened her life on several occasions. Tr. 116–118. The court finds this testimony unpersuasive.

The plaintiff continued to appear at Gintick's bus stops throughout the hearings before the court on the plaintiff's motion for a preliminary injunction. Tr. 452–454.

### CONCLUSIONS OF LAW

The plaintiff argues that a preliminary injunction barring the enforcement of Conn.Gen.Stat. § 53a–181d against her is necessary to prevent the loss of her constitutional rights to associate with others and to travel. It is well established that a court in this Circuit may grant a preliminary injunction only where the movant demonstrates irreparable injury *and* either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation together with the balance of hardships tipping decidedly in the movant's favor. *Bridgeport Coalition v. City of Bridgeport*, 28 F.3d 102 (2d Cir.1994). Under this standard, if the movant is unable to demonstrate irreparable injury, an injunction cannot issue.

## I. *Irreparable Harm*

■ In determining the existence of irreparable harm, our Court of Appeals has developed important principles. The threatened harm must be "actual and imminent" and "not remote or speculative." *New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755 (2d Cir.1977). It is especially important to adhere to these strict rules under the circumstances presented here. The plaintiff asks the court to prevent a local police department from enforcing a state penal statute that is designed to protect Connecticut citizens from acts that may be the prelude to physical violence.[3] According to the Supreme Court, in this circumstance we should be reluctant to grant the plaintiff's request:

> [R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate.

*City of Los Angeles v. Lyons,* 461 U.S. 95, 112, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983).

In *Lyons,* the Supreme Court dismissed the plaintiff's application for an injunction against the use of chokeholds by the Los Angeles police for failure to present a case or controversy, even though the plaintiff had been subjected to a chokehold once before. *Id.* at 101–113, 103 S.Ct. at 1664–71. Under *Lyons,* then, the plaintiff must demonstrate a "real or immediate threat that the plaintiff will be wronged *again.*" *Id.* at 111, 103 S.Ct. at 1670 (emphasis supplied). Accordingly, even assuming *arguendo* that the plaintiff in the instant case did not act in violation of the state statute and was thus somehow "wronged" when she was arrested for stalking, she must demonstrate a real or immediate threat that she will be arrested *again* for exercising her constitutional rights. The plaintiff has not made such a showing.

The plaintiff's claim that she will be arrested again is nothing more than pure speculation. The circumstances surrounding the plaintiff's arrest on September 20, 1993, illustrate the weakness of her claim. The facts indicate that the plaintiff did indeed follow Gintick repeatedly. The plaintiff would appear at several of Gintick's bus stops on a daily basis, sometimes gesturing at Gintick in a threatening manner. Blardo, a Hartford Police Officer who arrested the plaintiff, had been informed by Gintick of the plaintiff's actions shortly before he made the arrest. The plaintiff's appearance at Gintick's bus stop at 2:55 p.m. on the afternoon of her arrest corroborated Gintick's claim that he was being followed, Gintick having predicted to Blardo that the plaintiff would be there at that time. Upon seeing the plaintiff at Gintick's bus stop, Blardo advised her to stay away from him, arresting the plaintiff only after she became unruly. In Blardo's view, the plaintiff posed a threat to those around her, especially to Nolan, Gintick's girlfriend, who also was present at the scene and was the target of an outburst of profanity by the plaintiff immediately prior to the plaintiff's arrest. Subsequently, the plaintiff was charged with stalking in the second degree in violation of Conn.Gen.Stat. § 53a–181d, but the charge was dismissed.

The plaintiff presents no evidence that the sequence of events just described is likely to recur. By deciding to investigate the matter, Blardo responded to what turned out to be a credible complaint by Gintick that he was being followed by the plaintiff on a repeated basis. Even after witnessing the plaintiff at Gintick's bus stop, Blardo did not initially intend to arrest the plaintiff, but, rather, only to warn her that she would be arrested if she continued to follow Gintick. Nevertheless, Blardo had grounds to believe the plaintiff was violating Connecticut's stalking law when he arrested her.

There is no persuasive evidence in the record to suggest that the police are determined to arrest the plaintiff again, as she claims. Plaintiff's Affidavit in Support of Preliminary Injunction ¶ 20. The fact that the plaintiff keeps a detailed log of her whereabouts and explanations for them be-

---

**3.** *See State v. Culmo,* 43 Conn.Supp. 46, 51–53, 642 A.2d 90 (1993) (discussing legislative history of Conn.Gen.Stat. § 53a–181d).

cause she fears arrest is not sufficient to justify injunctive relief. An unreasonable fear does not constitute irreparable harm. *Cf. Lyons,* 461 U.S. at 107, n. 8, 103 S.Ct. at 1668, n. 8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." (emphasis in original)). In fact, the plaintiff is free to travel wherever she pleases and to associate with whomever she pleases so long as she does not invade the rights of others. *See Grayned v. City of Rockford,* 408 U.S. 104, 118, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222 (1972) (expressive activity on public sidewalks near school grounds can be restricted if it "involves substantial disorder or invasion of the rights of others.").

Finally, the court does not credit the testimony of the plaintiff that she happens to cross Gintick's path several times a day merely in the exercise of her constitutional rights. Indeed, the plaintiff makes too many appearances at Gintick's bus stops to be dismissed as coincidence. Connecticut legislators supporting the stalking statute relied on statistics and reports which drew a link between stalking and violent acts. *Culmo,* 43 Conn.Supp. at 52–53, 642 A.2d 90. In *Culmo,* Judge Douglas Lavine described eloquently the purpose of the statute:

> Providing protection from stalking conduct is at the heart of the state's social contract with its citizens, who should be able to go about their daily business free of the concern that they may be the targets of systematic surveillance by predators who wish them ill. The freedom to go about one's daily business is hollow, indeed, if one's peace of mind is being destroyed, and safety endangered, by the threatening presence of an unwanted pursuer.

*Id.* at 70, 642 A.2d 90.

The plaintiff may exercise her constitutional rights without fear of arrest or prosecution so long as she does not abuse them. In this respect, she is no more entitled to an injunction than any other Connecticut citizen.

For the reasons stated above, the court finds that the plaintiff has failed to demonstrate irreparable harm.

## II. *Likelihood of Success on the Merits*

Even if the plaintiff demonstrated irreparable harm, she would not be entitled to a preliminary injunction because she has failed to establish likelihood of success on the merits. In her motion, the plaintiff argues that the statute under which she was arrested, Conn.Gen.Stat. § 53a–181d, is both unconstitutionally vague and overbroad. Additionally, she contends that her arrest was illegal under Connecticut law and violated her Fourth Amendment right to be free from unlawful and unreasonable arrests and her Fourteenth Amendment right not to be deprived of liberty without due process of law. For the reasons that follow, the plaintiff has failed to prove a likelihood of success on any of these claims.

### A. *The Overbreadth Claim*

■ Because the overbreadth doctrine has never been recognized outside the context of the First Amendment, *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *Lutz v. City of York,* 899 F.2d 255, 270–71 (3d Cir.1990) (noting that overbreadth doctrine is a strong remedy and is thus applicable only in the First Amendment context because of the transcendent value of free speech), the plaintiff may not be entitled to raise an overbreadth claim in the instant case. The plaintiff alleges (without elaboration) that the Connecticut stalking provision interferes with her right to associate with friends. Plaintiff's Proposed Findings of Fact at ¶ 75, Plaintiff's Motion for Preliminary Injunction at ¶ 9. The Supreme Court, however, has identified two strands of the right to associate—the "freedom of intimate association," located in the Fourteenth Amendment's concept of liberty, *see Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984), and the "freedom of expressive association" that originates in the First Amendment; the latter is "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. at 3249.

The plaintiff in this case does not specify which right of association she claims the Connecticut stalking law infringes. The language the plaintiff employs, such as "visit her friends" and "associate with others," suggests the Fourteenth Amendment associational interest—which protects, to varying degrees, "a broad range of human relationships." *Id.* at 620, 104 S.Ct. at 3251.[4] Furthermore, the plaintiff's failure to allege infringement of the various activities protected by the First Amendment suggests that her asserted right is located in the Fourteenth Amendment realm of associational interests.[5] It would appear, therefore, that the plaintiff may not challenge Connecticut's stalking law on overbreadth grounds.

Even assuming the plaintiff may assert an overbreadth challenge, it is not likely that she would succeed on the merits of her claim that the Connecticut stalking statute is overbroad. In determining whether a statute is overbroad, the court looks to the principles set out in the famous First Amendment case, *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). There, the Supreme Court noted that the "function" of the overbreadth doctrine "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests." *Id.* at 615, 93 S.Ct. at 2917. Accordingly, the *Broadrick*

Court held that "where conduct and not merely speech is involved ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*

The Connecticut stalking statute does not proscribe speech—it prohibits only conduct. *See supra* note 1. Because the statute only prohibits conduct, it falls squarely within the requirement that the asserted overbreadth must be "substantial ... judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918.

This statute, as construed by Connecticut's state courts, can hardly be described as substantially overbroad, for it does not reach a "substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (upholding ordinance regulating the sale of drug paraphernalia against overbreadth and vagueness challenge because it does not reach substantial amount of constitutionally protected conduct and is reasonably clear in its application to complainant). In *State v. Culmo,* 43 Conn.Supp. 46, 642 A.2d 90 (1993), Judge Lavine provided a thorough and well-considered explanation of the language of Conn.Gen.Stat. § 53a–181d. First, the term "physical safety" requires a finding that "a person charged under the statute has acted with the intention to cause a victim to fear that he or she could be

---

4. The contours of the right of intimate association are not well defined. In *Roberts,* the Court made clear that family relationships are entitled to substantial protection under this right. *Id.* at 619, 104 S.Ct. at 3250 (citing *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (marriage); *Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (childbirth); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (cohabitation with one's relatives)). The Court reasoned that, "only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.* 468 U.S. at 620, 104 S.Ct. at 3251. On the other hand, the Court noted that a business enterprise was "remote from the concerns giving rise to this constitutional protection." *Id.* The plaintiff's asserted right to associate with her friends in downtown Hartford would appear to fall somewhere between the intimacy of a family and the formality of a business relationship.

5. The plaintiff also alleges interference with her right to travel to downtown Hartford. *See* Motion For Preliminary Injunction at ¶ 8. Any constitutional right of *intra* state travel, if one exists, is likewise not protected by the First Amendment. *See Lutz, supra,* where the Court of Appeals for the Third Circuit upheld an ordinance outlawing "cruising" against a constitutional challenge by two individuals alleging that the law violated their right to travel. The *Lutz* court discussed comprehensively the Supreme Court's right to travel cases and concluded that, "no constitutional text other than the Due Process Clause could possibly create a right of localized intrastate movement, and no substantive due process case since the demise of *Lochner* has considered whether the clause in fact does create such a right." *Lutz,* 899 F.2d at 267.

subjected to bodily harm." *Id.* at 61, 642 A.2d 90. Second, the word "wilful" requires a finding that the defendant acted with "a bad purpose." *Id.* at 62, 642 A.2d 90. Third, the word "repeatedly" requires a finding that the defendant followed the victim or lay in wait for the victim "on more than one occasion." *Id.* Fourth, the "following" must be intentional, with a "predatory thrust to it," as opposed to following that is aimless or accidental. *Id.* at 63, 642 A.2d 90. Fifth, "lying in wait," requires a finding of "watching, waiting and concealment." *Id.* at 64, 642 A.2d 90. Finally, the "reasonable fear" language imposes both a subjective and objective standard. The finder of fact must view the circumstances from the victim's perspective, but must conclude that the victim's fear in those circumstances was objectively reasonable. *Id.* at 64–66, 642 A.2d 90.

Under Conn.Gen.Stat. § 53a–181d, an individual's freedom of movement and right of association is deterred only if that individual intends to make another person fear for his or her physical safety by deliberately following or lying-in-wait for that person on a repeated basis. Yet this chilling effect raises no constitutional problems because it is well-settled that no one can use constitutional rights to invade the rights of others. As the Supreme Court has repeatedly held, expressive activity may be prohibited if it "involves substantial disorder or invasion of the rights of others." *Tinker v. Des Moines Independent Community Sch. Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969) (regulation prohibiting wearing of armbands to schools violates First Amendment in absence of evidence that such conduct substantially disrupts school activities). *See also Madsen v. Women's Health Center, Inc.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (abortion protesters' First Amendment rights may be restricted in order to protect the rights of women seeking medical or counseling services); *Frisby v. Shultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (abortion protesters' First Amendment rights may be restricted to protect residential privacy); *Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (protesters' First Amendment rights may be restricted to ensure proper functioning of for-

eign embassies); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (right to protest ends where such protest disturbs proper functioning of a school). Stalking, as defined by Conn.Gen. Stat. § 53a–181d and persuasively interpreted in *Culmo,* constitutes a substantial invasion of the rights of the target; it is conduct legitimately subject to prohibition.

Moreover, the Supreme Court has held that "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection." *Roberts,* 468 U.S. at 628, 104 S.Ct. at 3255. The Connecticut stalking statute was designed to punish acts that might serve as a precursor to violence. *See Culmo,* 43 Conn.Supp. at 51–53, 642 A.2d 90 (discussing legislative history and evidence offered by legislators that stalking precedes violent acts). The statute punishes only the type of following or lying-in-wait that is done repeatedly with an intention to cause the victim to fear for his or her physical safety. Whether or not the stalking outlawed in Connecticut's statute does in fact lead to violent acts, it produces a fear in its victims that renders it undeserving of any constitutional protection. Far from reaching "substantial amounts of protected expression," *see Hoffman Estates,* 455 U.S. at 494, 102 S.Ct. at 1191, Conn.Gen.Stat. § 53a–181d is narrowly tailored to prohibit only unprotected conduct. The court therefore concludes that the plaintiff's overbreadth claim is unlikely to succeed on the merits.

### B. *Void-for-Vagueness Claim*

The plaintiff also faces obstacles to asserting her vagueness claim. Although the plaintiff need not allege the infringement of her First Amendment rights in order to challenge a statute as unconstitutionally vague, she cannot raise the claim if the Connecticut stalking provision clearly applies to her conduct. *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. at 1191; *Parker v. Levy,* 417 U.S. 733, 753, 756, 94 S.Ct. 2547, 2560, 2562, 41 L.Ed.2d 439 (1974). In other words, there is no standing to challenge a statute on vague-

ness grounds solely for the purpose of vindicating the rights of third parties.

In the circumstances presented here, the Connecticut statute clearly applies to the plaintiff's conduct. After she was forced to leave Gintick's home, the plaintiff began appearing at several of Gintick's bus stops on a virtually daily basis, made threatening gestures at times, took photographs of the defendant, and on at least one occasion got on his bus and sat behind him. These actions constitute repeated "following" that was intentional and done with an intent to cause the defendant to fear for his physical safety. Accordingly, the plaintiff does not have standing to make a facial vagueness challenge.

■ Even if the plaintiff could be said to have standing here, her claim would be unlikely to succeed because a law is void on its face only if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The purpose of the void-for-vagueness doctrine is to ensure that a statute (1) provides fair warning to ordinary citizens of what is prohibited and (2) provides standards to cabin the discretion of local officials in order to eliminate the risk of arbitrary and discriminatory enforcement of the law. *Grayned,* 408 U.S. at 108–109, 92 S.Ct. at 2298–99. The fact that the Connecticut stalking statute has a specific intent requirement goes a long way toward avoiding any vagueness problem. *See Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. at 1193 ("a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*"); *Screws v. United States,* 325 U.S. 91, 101–104, 65 S.Ct. 1031, 1035–37, 89 L.Ed.

1495 (1943) (plurality opinion) (requirement of specific intent saves Civil Rights Act from being invalidated on grounds of vagueness because "[o]ne who does act with such specific intent is aware that what he does is precisely that which the statute forbids."); *compare Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (ordinance that punished activity on sidewalks that was annoying to others is unconstitutionally vague).

In stark contrast to the ordinance invalidated in *Coates,* the Connecticut stalking statute requires that (1) the defendant *intend* to commit the prohibited act, (2) the defendant *intend* to create in his victim a particular state of mind, and (3) the victim's response be *reasonable* given the circumstances. Any person who intends to cause another to fear for his or her physical safety by repeatedly following or lying-in-wait for the person can justifiably be presumed to know that such conduct is prohibited by the Connecticut stalking provision. As the Supreme Court has recognized, "condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300. Although words such as "repeated" and "following" are susceptible to more than one meaning, they are sufficiently clear to put a person of common intelligence on notice of the prohibited conduct.

Moreover, the Connecticut statute is specific enough in its description of the prohibited conduct to reduce, if not necessarily eliminate, the risk of arbitrary and discriminatory enforcement. In order to arrest someone for stalking, a police officer must have grounds to believe that such person is intentionally and repeatedly following or lying in wait for someone and that such conduct has made its target fear for his or her physical safety.

In the instant case, Blardo arrested the plaintiff after corroborating a complaint by Gintick that the plaintiff was intentionally following him. And the State's Attorney chose not to prosecute the stalking charge against the plaintiff.[6]

6. The court heard testimony about the arrest of Daniel Perez, an employee of the International Ladies Garment Workers Union, pursuant to a complaint that he was following a company van. He was charged with stalking but the charges in his case were also dismissed. In his testimony,

As the statute cannot be characterized as "vague in all of its applications," *see Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191 (if statute does not implicate constitutionally protected conduct, vagueness claim may be upheld only if the statute is vague in "all of its applications"), the plaintiff's vagueness challenge is also unlikely to succeed on the merits.

### C. *The Unlawful Arrest Claim*

■ The plaintiff alleges that Officer Blardo did not have probable cause to arrest her for stalking under Conn.Gen.Stat. § 53a–181d. The validity of Officer Blardo's warrantless arrest of the plaintiff is determined by state law. *See United States v. Fisher*, 702 F.2d 372, 375 n. 6 (2d Cir.1983). Conn. Gen.Stat. § 54–1f(a) provides that a municipal police officer may make a warrantless arrest for a misdemeanor, such as stalking in the second degree, only "when the person is taken or apprehended in the act or on the speedy information of others." Since Officer Blardo received information about the plaintiff several hours before the arrest[7], he did not arrest the plaintiff on "speedy information." *Compare State v. Barles*, 25 Conn. Supp. 103, 197 A.2d 339 (1964) (information received one hour before defendant's arrest). This does not mean, however, that Officer Blardo was precluded from using the information he had in determining whether probable cause existed to arrest the plaintiff "in the act."

Probable cause is determined from the "totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). An officer has probable cause to arrest when "the [officer] ha[s] knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir.1987) (citation and internal quotation marks omitted); *see also Beinhorn v. Saraceno*, 23 Conn.App. 487, 492, 582 A.2d 208, *certif. denied*, 217 Conn. 809, 585 A.2d 1233 (1990).

■ Based on the totality of the circumstances presented on this record, Officer Blardo had reason to believe that the plaintiff was stalking Gintick at the time he made the arrest. Gintick's complaint led Officer Blardo reasonably to believe that Gintick feared for his physical safety. *See* Tr. at 383. Gintick had told Officer Blardo that the plaintiff was appearing at several of his bus stops on a daily basis and predicted that the plaintiff would be at a particular bus stop in downtown Hartford at 2:55 p.m. on September 20, 1993. Because Officer Blardo had previously been denied warrants to arrest alleged "stalkers," he decided that it would be best to observe the stalking activity himself in order to establish probable cause, if it indeed existed. Thus he decided to go to defendant Gintick's bus stop at 2:55 p.m. to see if the plaintiff would appear as predicted. The plaintiff having appeared, Officer Blardo identified himself, informed the plaintiff of the complaint against her, and warned her to cease stalking Gintick. Upon seeing defendant Nolan, Gintick's girlfriend, the plaintiff became unruly and Officer Blardo decided to arrest her.

In light of the information Officer Blardo possessed at the time, he had probable cause to believe that the stalking offense was being committed. That the plaintiff appeared at the bus stop as predicted by Gintick reinforced the credibility of Gintick's complaint

---

he explained that the purpose of following a vehicle is to acquire information about the company, rather than intimidate the passengers inside. He stated also that he does not follow customers of the business establishment to their vehicles or home. He testified that he did not know of any other union worker who had been arrested or prosecuted under the stalking statute. It thus appears that, up to this point, the specific intent and conduct requirements in the statute have led the State's Attorney to dismiss stalking

charges that may not have had a high likelihood of success.

7. The court need not decide whether Gintick and Nolan met with Officer Blardo in the morning of the day plaintiff was arrested or the day before. *See* Plaintiff's Proposed Findings of Fact ¶ 22; Proposed Findings of Fact of Defendants Gintick and Nolan ¶¶ 13, 15; Tr. 341, 346. Whichever was the case, the officer was not acting on "speedy information" when he made the arrest.

about the plaintiff's daily following of Gintick. And the plaintiff's outburst upon seeing defendant Nolan, in addition to the complaint brought by Nolan and Gintick, gave the officer reason to believe that Nolan and Gintick had cause to fear for their physical safety.

The plaintiff argues that Officer Blardo "did not observe the plaintiff following Gintick or Nolan." Plaintiff's Proposed Conclusions of Law at 10. That the plaintiff was not actually walking behind defendant Gintick or walking behind his bus does not mean that she was not "following" Gintick. The plaintiff's repeated appearances at Gintick's bus stops is undoubtedly a form of "following," and Officer Blardo could have reasonably concluded that by appearing at Gintick's bus stop—as Gintick had predicted—the plaintiff was "following" him. Officer Blardo therefore did not violate Conn.Gen.Stat. § 54–1f, because he had probable cause to believe that he was apprehending the plaintiff "in the act [of stalking]."

In sum, the plaintiff's claim of unlawful arrest is likewise unlikely to succeed on the merits.

### III. *Balance of Hardships*

▇ Where the plaintiff cannot show that she is likely to succeed on the merits, she can still secure an injunction by proving (1) irreparable harm and (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, together with the balance of hardships tipping decidedly in her favor. *Blum v. Schlegel,* 18 F.3d 1005, 1007 (2d Cir.1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Because the plaintiff here has failed to show irreparable harm—a *sine qua non* of preliminary injunctive relief—the court need not address the balance of hardships. But even if the court assumed for the argument that there had been an adequate showing of irreparable harm, the balance of hardships does not, on the basis of this record, tip in favor of the plaintiff, much less tip *decidedly* in her favor.

The plaintiff complains that her past arrest and fear of future prosecution has had a chilling effect on her right to travel freely and her right to visit with friends. Yet the plaintiff in reality can exercise those rights with nothing to fear so long as she does not continue to appear at Gintick's bus stops on a repeated basis. And continuing to engage in her past behavior would not constitute an exercise of her constitutional rights—but, rather, an abuse of those rights to the extent she has made Gintick fear for his safety. The status quo therefore is quite acceptable in the absence of an injunction.

On the other hand, imposing an injunction would constitute substantial interference with the law enforcement responsibilities of the local police. The stalking statute provides the police with a tool to stop criminal activity at an incipient stage. The legislature that enacted the law—like the forty-nine other jurisdictions that have enacted similar legislation—believed stalking behavior has the potential to escalate into physical violence and believed that such a law filled a "gap" in the then-existing version of the criminal code. *See State v. Culmo,* 43 Conn.Supp. 46, 52, 642 A.2d 90 (1993). Barring the police from enforcing this statute against the plaintiff might therefore prevent the police from using the only viable means it has to intercede in a potentially explosive situation. The court therefore concludes that the balance of hardships does not tip sharply in favor of the plaintiff—in fact, the balance of hardships tips the other way, in favor of the City of Hartford and its police.

### CONCLUSION

Based on the record, and for the reasons stated above, the plaintiff's Motion For Preliminary Injunction (filed January 10, 1994) (doc. # 3) is hereby DENIED.

It is so ordered.